DIAZ, J.,
for the Court:
¶ 1. Minnie Lee Williams Friar, Frank Ray Penton, Jr., Bruce Henry Penton, and Minnie H. Penton, the appellants, contest the lower court’s decision to quiet title of a disputed parcel of property in favor of Irvin F. Templett, Jr., Linda F. Templett, James P. McCormick, and Jessica McCormick, the ap-pellees. Feeling aggrieved by this decision, the appellants argue that the chancellor erred in finding that the appellees produced clear and convincing proof of each of the elements of adverse possession. Finding this assignment of error without merit, we affirm.
FACTS
¶2. This case arose from a dispute over title to a parcel of land located in Pearl River County. The parcel claimed by Ms. Friar and the Pentons is a small strip of land that is approximately 60 feet wide on the east end and runs approximately 1,315 feet to the west where it narrows to about 12-15 feet wide. It is the northern boundary of property described as the south 1/3 of the SE 1/4 of the SE 1/4 of NE 1/4 of Section 26 in Township 4 South of Range 17 West, containing 13 1/3 acres, more or less.
¶ 3. The Templets and McCormicks claim title to the disputed tract of land based upon a series of conveyances beginning February 14, 1976. Ms. Henrietta Penton, the widow of Lawrence Penton, conveyed title to the property to Carl W. Mangus and his wife, Dortha Marie Wood Mangus, pursuant to warranty deed. In turn, the Manguses conveyed title of this property to the Templets on July 1,1986, pursuant to a warranty deed. Thereafter, the Templets conveyed title of a two acre tract of land located in the southwest corner to the McCormicks, their daughter and son-in-law, on November 23, 1993.
¶4. Ms. Friar and the Pentons’ claim to the disputed parcel of real property began with a September 4, 1942 conveyance from Pearl River County to Frank R. Penton. He died intestate leaving as his heirs-at-law his wife, Minnie H. Penton, and his three children, Minnie Lee Williams Friar, Frank Ray Penton, Jr., and Bruce H. Penton, the appellants herein. In September 1990, a quitclaim deed was executed to Ms. Friar, Frank Ray Penton, Jr., and Bruce Henry Penton, with a life estate being reserved to Minnie H. Pen-ton.
¶ 5. The disputed strip of real property is located across and runs the full length of the southern boundary of the Templets and McCormicks’ real property. A road known as the “southern boundary road” or “Minnie Penton Road” lies adjacent to and immediately south of the subject strip of real property. The Templets and McCormicks’ south boundary fence runs along Minnie Penton Road and ties into their east and west boundary fences. Until 1994, the strip of real property was enclosed by the Templets and McCormicks’ south boundary fence which ran the full length of their real property. The perimeter fence was in place when the Manguses purchased the property from Henrietta Penton in 1976 and remained in place continuously until Ms. Friar and the Pentons removed a portion of the fence along the southern boundary of the Templets and McCormicks’ real property.
¶ 6. The Manguses testified that the southern boundary fence was standing when they purchased the property in 1976 and that they repaired and maintained that property during their ownership. Additionally, the Man-guses testified that they purchased from Henrietta Penton all property which was under fence, including the disputed strip. Mr. Mangus also testified that he had leased some of the property which included the disputed strip to Dalton Penton in return for maintenance of the property. Dalton Penton pastured his livestock on the property and sold sod from the property. The Manguses testified that they raised a garden, cut timber, repaired the barn, stored cars in the barn, and posted “No Trespassing” signs on the property. Furthermore, Mr. Mangus spread the word in the McNeill community that he would shoot anyone he caught trespassing within the fenced boundaries of his property. Finally, he testified that he frequently performed these activities in full sight of everyone including Ms. Friar and the *519 Pentons and that he never asked permission nor was he told not to do them.
¶ 7. Testimony by the Templets further established that the southern boundary fence was standing at the time of their purchase of the property from the Manguses in July 1986. The Templets testified that they repaired and maintained the southern fence as their property line and erected an electric “hot” fence along the existing southern boundary. Additionally, the Templets testified that they were sold all the property enclosed by the perimeter boundary fence, including the disputed strip of real property. They testified that they immediately started using the entire property once it was purchased. Mr. Templet testified that he repaired and maintained the perimeter fence, pastured cows, cut timber, erected an electric fence along the southern boundary fence, planted one thousand red cedar pine trees, engaged in spring burning, cleaned the property to keep it neat, and lived on the property with his wife since 1987. Furthermore, he did not ask permission to do these activities and no one stopped him from doing them on his property.
¶ 8. Mike Harris testified that he owned property east of the Templets and McCor-micks’ real property. He stated that he has known of the area involving the disputed strip since 1939. From his personal knowledge, he testified that the southern boundary fence was in the same location as it was when it was erected in the early 1940’s.
¶ 9. Ms. Friar and the Pentons testified that they patched a hole in the southern boundary fence, installed a metal gate, and cut some trees from the fence that fell across the road after a hurricane. Ms. Friar testified that she may have cleaned brush from the fence line. Frank Penton, Jr., testified that he was allowed to keep horses on the property when Henrietta Penton owned it as long as no damage resulted. Bruce Penton testified that he kept a horse on the disputed property the year before Mr. Mangus sold the property to the Templets.
¶ 10. The trial on this matter began March 30, 1995, was recessed, and then completed on August 15, 1995. The chancellor issued his memorandum opinion on February 27, 1996 and directed the appellees herein to prepare the judgment in accordance with his opinion. The final judgment was signed on March 25, 1996 and filed on April 1, 1996. The appellants herein filed a motion to reconsider or, in the alternative, for a new trial or in the alternative a motion for rehearing on April 2, 1996. The chancellor denied the motion for a new trial, and this appeal was taken.
DISCUSSION
¶ 11. This Court applies a limited standard of review on appeals from chancery court. Reddell v. Reddell, 696 So.2d 287, 288 (Miss.1997). We will not interfere with the chancellor’s findings unless he was “manifestly wrong, clearly erroneous or an erroneous legal standard was applied.” Bell v. Parker, 563 So.2d 594, 596-97 (Miss.1990).
¶ 12. Mississippi’s adverse possession statute provides in part:
Ten years’ actual adverse possession by any person claiming to be the owner for that time of any land, uninterruptedly continued for ten year-s by occupancy, descent, conveyance, or otherwise, in whatever way such occupancy may have commenced or continued, shall vest in every actual occupant or possessor of such land a full and complete title....
Miss.Code Ann. § 15-1-13 (Rev.1995). From this statute, the supreme court has formulated a six-element test to determine whether possession is adverse. Rice v. Pritchard, 611 So.2d 869, 871 (Miss.1992). The claimant must prove that his possession is “(1) under claim of ownership; (2) actual or hostile; (3) open, notorious, and visible; (4) continuous and uninterrupted for a period of ten years; (5) exclusive; and (6) peaceful.” Id. Furthermore, it does not matter whether the real property claimed pursuant to adverse possession is within or without the description of the title deeds or that the real property claimed adversely be in the same quarter section or section. Id. Under an adverse possession analysis the question is:
whether the acts by the adverse possessor are sufficient to “fly his flag” over the land and to put the record title holder on notice *520 that the land is being held under an adverse claim of ownership.
Id. (citing Johnson v. Black, 469 So.2d 88, 90-1 (Miss.1985)).
¶ 13. Mississippi law allows tacking of one adverse possession to another as long as there is privity of possession existing between the predecessor and the claimant. Walters v. Rogers, 222 Miss. 182, 75 So.2d 461, 462 (Miss.1954). Privity may be established or created by conveyance, agreement, or understanding which in fact transfers possession. Id.
¶ 14. As to the first element, the Man-guses claimed ownership of the disputed property since its purchase in 1976 from Henrietta Penton. Thereafter, the Templets have claimed ownership of the property since they purchased it from the Manguses in 1986. The McCormicks claim ownership to their parcel by virtue of purchasing it from the Templets in 1993. The second element requires either actual or hostile possession. The record reflects that the Mangus, Tem-plet, or McCormick families have been in actual, physical possession of the property since 1976, during which time they have cut timber, sold sod, pastured animals, planted trees and gardens, repaired and maintained fences, repaired barns, built homes, and or stored cars on the property. Third, all three families’ possession of the land has been open, notorious, and visible to anyone traveling on several sides of the property including driving on Minnie Penton Road.
¶ 15. As for the fourth element, the Man-guses, Templets, or McCormicks have held the disputed land in continual, uninterrupted possession since 1976. In fact, the Manguses met the ten year adverse possession requirement before they conveyed their interest in the property to the Templets. Furthermore, the Manguses and Templets were in privity through the warranty deed executed by the Manguses to the Templets for the disputed property; therefore, the Templets and McCormicks could claim the land by adverse possession since Mississippi law allows for tacking of one adverse possession to another so long as privity exists between the grantor and grantee. The fifth element requires exclusive possession of the subject property. The Manguses, Templets, and McCormicks testified that there has never been a break in their family’s use or occupancy of the land. Finally, the possession of the land by each family has been peaceful since it was acquired in 1976. There have been no claims of ownership or other attempts to disturb the Templets and McCormicks’ possession of the subject property until the instant lawsuit was filed.
¶ 16. The Mississippi legislature enacted the adverse possession statute so as to resolve the problem of inattentive landowners who ignore their property over a long period of time. Clanton v. Hathorn, 600 So.2d 963, 966 (Miss.1992). Although Ms. Friar and the Pentons lived near the disputed property, they failed to provide evidence of exercising any of the customary acts of ownership. Applying the relevant Mississippi law to the facts of this case, we find that the chancellor correctly concluded that the Templets and McCormicks were entitled to the disputed strip of property by virtue of the adverse possession statute.
¶ 17. THE JUDGMENT OF THE PEARL RIVER CHANCERY COURT IS AFFIRMED. COSTS OF THIS APPEAL ARE ASSESSED TO THE APPELLANTS.
BRIDGES, C.J., McMILLIN and THOMAS, P.JJ., COLEMAN, HERRING, HINKEBEIN, KING, PAYNE, and SOUTHWICK, JJ., concur.